. The good morning. They please support I am Patricia Rene, appearing on behalf of Mr. Adonis Perry. Mr. Perry has raised quite a few issues in this appeal, beginning with the roadside stop and whether or not that was or constitutes an unlawful seizure of this person. Mr. Perry maintains that because the stop lasted longer than necessary to effectuate the purpose of the stop, it constituted an unlawful seizure. The purpose of the stop supposedly was speeding and to investigate whether or not the tags on the car were legitimate. I would ask the court at this point to discount. Does your argument depend on that? Your argument is that this was merely a stop to address traffic violations? Correct. The court below and the government argues that that is not true. The stop was to investigate the reasonable suspicion of criminal activity that arose in cases like Wardlow from the evasive behavior of the vehicle. Well, the government is alleging because of the time of day and the high crime area, somehow that and the plea and the fact that they fleed from the officers when we have to accept the findings made by the court below in the light most favorable to the government, because they prevailed. That is correct. However, I characterize it as speeding, because in order to have flight, there is no evidence of any eye contact made between Mr. Perry and the officers. I appreciate the fact that you're deferring to... I understand the argument. I guess what I'm trying to get at, I understand you have a factual dispute, perhaps. But does your argument depend on that? So in other words, if they had reasonable suspicion of criminal activity in light of flight, if, this is a hypothetical, then you agree the stop was constitutional. Your argument is that they didn't have reasonable suspicion of criminal activity when they pulled them over outside of the traffic violations. Outside of the traffic violations. That is correct. Now, as far as investigating the tags on the car, I don't know that that constitutes criminal activity that, to me, still falls under a traffic stop in order to investigate that. The issue that I'm having with that part of the factual basis is, at the conclusion of the stop, the officers allowed her, Ms. McCarra, to drive away in that same vehicle that was supposedly, you know, the subject of why the vehicle was stopped in the first place was to investigate the tags. They never investigated the tags, or at least they never concluded that the tags were invalid, that the tags were valid. So at the end of the day, they allow her to drive away in this vehicle, giving her the keys saying, we're not watching you drive away, as they give her the keys. So if that's one of the basis for the stop, that action on the part of the law enforcement basically undermined the purpose of the stop in the first place. So then what we're left with is basically speeding, traffic violations, to the extent that speeding can be characterized as flight. So let's just say that we are investigating flight. There's no evidence or nothing came about that to determine or to help the officers dispel or confirm their suspicion as to whether or not there was flight, or they were trying to get away. So really- But if they determine, I mean, the district court found, or I guess it was the magistrate judge adopted by the district court, but the court below found that there was flight, and if that's true, if we accept that factual finding, Wardlow tells us that that's reasonable suspicion of criminal activity, that that allows them to at least ask for consent to search, no? Well, we don't get the request for consent to search until five minutes into the traffic stop. And so I am saying that for those first five minutes, the officers are, or his attention is lasting longer than is necessary to effectuate what the purpose of that stop is, even if it's flight. Within five minutes, you cannot determine that, and that's not what the questioning was about. The questioning was about the legitimacy of the tags and whether or not they were speeding, according to what was being- So the magistrate, in her order, cites that the circumstances that extended the stop was that the time of night, high crime, the handwritten vehicle, the car's acceleration through two lanes, the vehicle, that Perry's climbing over the center console, blue bandanas signaling gang affiliation, and then some. That's what the magistrate, so it appears to be more than just them asking about the tags on the car. So when we're talking about the blue bandana, that occurs much later during the stop. So again, we're talking about, and of course, as the court knows, when they support the amendment analysis, the court has to take each thing step by step. So the initial basis for the stop did not include all of that. The initial basis was the speeding, the high crime area, et cetera, but this court has already held in Black and in Jones that the high crime area portion of it, that's just a circumstances of economics. So the fact that they're in a high crime area in and of itself means nothing. The time of night, there's really, the officers have to be able to articulate specifically the basis for the stop. And it appears as if the reason the stop occurred in the first place was the question about the tags. And that's why the officers made the U-turn and tried to pull them over was to investigate the validity of the tags. So that was the initial basis of the stop. Now of course, in between noticing the tags and actually stopping the vehicle, the officers noticed that there was speed and these quick turns or whatever, whatever. Okay, so let's add that to the basis. We're going to investigate that. So there's really, within these first five minutes, the officers are really not able to articulate a specific reason for this stop other than those two things. Yes, other things develop later on. But the fact that the passenger side door is open is not evidence or suggestion of any criminal activity. The fact that Mr. Perry comes out behind Ms. McCarr is not evidence. These things may be subjectively suspicious, but they have to be objectively suspicious in order for... Again, even in the Woodlow case that we're talking about, we're talking about officers making decisions based upon experience. We don't have experienced officers here. We have two officers with less than one year of experience each. And I want to just kind of move past that a little bit. My, or Mr. Perry's, position here is that the stop lasted longer than what was reasonably necessary. The officers deviated from the stop by trying to get information as to whether or not his rights to own a weapon were restored, whether or not he was somehow engaged in gang activity. That is a deviation from the stop. It prolonged the stop, and it really amounted to a wholesale intrusion upon his constitutional rights. And the fact that they handcuff him and lock him in the back of a police car is tantamount to an arrest requiring probable cause. It's our position that the evidence should be suppressed on that basis. But assuming the court disagrees, what the officers find as a result of the search given by Ms. McCarr, who indicated that she was the owner of the vehicle, they find two weapons in the car. The revolver is inside of Ms. McCarr's purse. That is evidence of actual exclusive possession of that revolver by Ms. McCarr. The Glock is found somewhere between the passenger front seat protruding into the passenger rear under mounds of garbage and trash. The officer had to search for two minutes with a flashlight, still did not find it, came back later and found it. Because that Glock is not in plain view, there is no evidence that Mr. Perry has any knowledge of its presence, that is insufficient evidence to even find constructive possession. And it's because of, and one thing that's very critical with that, there was a fingerprint on the Glock, it did not match Mr. Perry. So there's no evidence of his possession of either one of those weapons as a result of the stop. And based upon that, the officers or Matthews decides, hey, we got to have some reason to, we got to find some evidence to kind of make this arrest stick. And then that segues and carries us over into this warrantless search of the cell phone. The, Matthews asked that the cell phone be brought to Norfolk, to Virginia. Ms. McCarr bring it, Mr. Perry had given it to her for safekeeping, but he restricted her use of that phone. He gave her specific restrictions and limitations on her use. And as a result, she did not have the authority to consent to the search of the cell phone. What were the limitations? The limitations that he put on that was, one, she could use the cell phone to accept his calls from the jail. Number two, she was to keep it with her at all times, which undermines any notion that she expressly consented to her turning it over to law enforcement. She was even to keep it in the car with her in case he called while she was driving. She was to use it to send and receive text messages to and from his family. She was to use it to send or to make and receive voice calls to and from his family. She was able to use it for her personal use until she was able to get minutes on her own phone. And once she got minutes on her own phone, she ceased to use it for her personal use. So she used it as instructed. And so as a result of that, she basically, she has no authority to, she didn't have the authority to consent or to turn that phone over. Now, the magistrate judge found that there was no, that she had apparent authority but no actual authority. The district court judge said, no, she had actual authority but no apparent authority. But clearly, she didn't have either because actual authority, Mr. Perry would have had to have given her express authorization to use that phone, which did not occur. Or he would have had, have given her mutual use of the phone or joint access or control over the phone. Mutual use is essentially her ability to use the phone in the same manner as he. That is the definition of mutual. By placing these restrictions and limitations, clearly, he did not give her that. So there is no actual authority. As far as apparent authority, as the case law indicates, that is an objective standard of reasonableness in which the courts have to examine the actual consent, which doesn't exist, as well as the surrounding circumstances, which are all of the restrictions and limitations that he placed on her use of the phone. When we look at apparent authority, we look at it from the position of the officers. And why would the officers have known, even assuming that there were restrictions on the use, why were they to have known those? We're talking specifically about Matthews. The way he would have known it is by his own admissions. He listened to all of those jail phone calls where Mr. Perry placed those restrictions and limitations by Ms. McCart. By his own admission testimony, he was aware of that. And that's why it makes it unreasonable for him to believe it. Where in the record do you see that he told her that she's supposed to keep the phone on her at all times? This is, I believe it is Matthews' testimony. It goes from essentially pages 611 through, I think it's like 628, and part of her, and Judge, I could very well be paraphrasing since he told her to keep it in the car, to keep it, you know, I could be paraphrasing that or interpreting that was to keep it with her at all times. But the reality is he never gave her consent to turn his phone over to a third party. And just to simplify it, if a stranger walks up and needs to use my phone because they're out of minutes and I allow them to use that, am I somehow, are they able to claim mutual use of my phone? Are they able to claim joint use of my phone? And also the idea that the officers, that Matthews went to the magistrate for a warrant undermines any notion that he reasonably believed that she had authority to consent. If he believed that, he would have just acted on that consent and searched the phone. The fact that he went to a magistrate undermines that argument. And the magistrate, knowing that he had the phone because it's in his affidavit, specifically we said no warrant. So that's when they're trying to figure out how do we get into that phone anyway. And Matthew said, we just decided that we could and to go ahead and search it. And of course that's not an exception to the warrant requirement at all. And my time is getting precarious here. So just, you know, I'll rely on my breeze for that. But the point is that there is no evidence in this record at all that there is any authority to search the phone, otherwise they wouldn't have had to go to the magistrate to get one. And if I may just briefly talk about some of the sufficiency issues, the witness tampering and obstruction. What we have here is in JA, the appendix 1109, Matthews says that Mr. Perry never told Ms. McCarra to lie. And appendix JA 1104, he says that Perry never told her not to show up to the grand jury. What we have is Ms. McCarra acting on her own volition from the beginning. She gives a false address so that she can avoid process and not appear at any of the hearings. She missed five court dates in state court of her own volition. She's refusing to take his calls. She's pretending to be her sister when he does call. Matthews has to go through the mother in order to reach her. And she stated she was not going to appear in court, and in fact, again, she missed five court hearings based on that. As far as the conflict, so basically, again, in order to support that, the evidence would have to show corrupt intent on the part of Mr. Perry. All he is doing is telling her, tell the truth. Because basically, she's told so many different versions of facts at the scene. And since that time, he's telling her, you need to tell the truth. And he's even telling her, consult with counsel. You know, if you record them, because we know they're pressuring you. They're trying to get you to do something that you should not be doing. Consult with counsel. Do what you need to do. But you need to tell the truth. That is not corrupt intent. And as far as there's an issue, the conflict with his trial attorney, the idea that the court merely assigned co-counsel, that did not resolve the issue. What it essentially did was deny him the right to counsel, or essentially gave him 50% counsel. That state, the attorney withdrew based on the conflict in state court in this same case. And then, here we are over in federal court. Here's that same attorney. The conflict didn't disappear, really because we moved to state court. It's still the same conflict. And the court should have appointed one counsel, which was the co-counsel, as the only counsel, rather than bring in that counsel in as co-counsel, which he only handled half of the case. So Mr. Perry is stuck with a counsel with conflict handling his other part of the case. As far as the destruction of evidence with the dash cam, that would have served to show who was driving and whether or not there were any furtive movements in the car, which was alleged, but we have no proof of it because they destroyed the body cam. The double jeopardy, all of these obstruction and witness tampering, it's all based on the same evidence and same facts. It's just basically taking a pie and cutting it into multiple pieces. At the end of the day, it's still one pie. OK? So that is multiple sentencing for the same offense. And so I will submit on my brief.  Thank you, Ms. Renee. Mr. Honnold? Good morning, Your Honors. May it please the court. Daniel Honnold for the United States. I think I'll start where my friend here started with the motion to suppress predicated on the traffic stop. The court here correctly found that the officers had reasonable suspicion to investigate additional crimes in addition to what was undisputably a valid basis to initiate the traffic stop, which was the evasive driving and the patently false tag. Were they running code? When did they start running code? Put the blue light on. I'm sorry, Your Honor. When did they start? When did they put the blue light on? So if Your Honor were to look at Officer Miller's body worn camera, the court can see that at axon watermark timestamp T50955. They had made the stop at that point. That's right, Your Honor. So are you saying that's the only evidence of when they put it on after they had made the stop? That's what it appears from the body cam. So is that eluding the police or speeding and running a stop sign? There's no, as I read the record, maybe that's why I ask you, that there was no indication that police officers were after them. I had indication. They just, and I agree to that, you observe a stop sign, failure to yield or whatever, stop. That may be it. But eluding? Where's the eluding if they haven't run code in terms of put this on or indicated pull over, pull over, something like that? So Your Honor, I'm not aware of any legal requirement that an officer activate their emergency sirens or... Well, how do you elude then? What's the evidence of eluding then? I'm driving and I commit a traffic offense. Every time I, because I failed to stop at a stop sign, if a police officer had to be behind me, I'm eluding the police officer? So Your Honor, here the officers were in a marked police cruiser and they passed each other while they were driving on the street. The clear inference from that is that the defendant was aware of the police officer's presence when he began to start driving dangerously and blow through those two stop signs. And the court is, of course, required to read the record in the light most favorable to the government, the prevailing party below and draw reasonable inferences in our favor. And that's clearly a reasonable inference that can be drawn here. Because the police officer made a U-turn after passing them, that means they were eluding the police when they failed to stop. Yes. At a stop sign. Yes, two stop signs. Two stop signs. Okay. All right. And then... Is that similar to the court's opinion in Illinois versus Wardlaw, right? So their police drive passed and the allegation was that when the defendant saw the police that he turned and ran, right, that that created reasonable suspicion? Yes, Your Honor. This is a variety of... That's not this case. Do you have evidence that they saw the police in terms of... Saw the police? Your Honor, they pass each other on the street at 12 o'clock at night. It's in... The officers are in a marked police cruiser. That is the evidence on this record that we have. And of course, the evasive behavior is just one of a series of factors that the district court pointed to. And this is at... So basically, it was a high crime area, right? Yes. And it was late at night? Yes. Right. And so they stopped them. Now, when they stopped them, they pulled their weapons out, didn't they? They did, Your Honor. There is more just to go back to... For failing to stop at a stop sign, they pulled their weapons out initially before saying a word to them. Is that right? So it's not... Is that right? No, it's not. It's not right? Okay. Tell me when did they pull their weapons out? They pulled their weapons out within seconds of making the stop. That's true. But there's no testimony that the reason that they did that is, I think... I didn't say that. I said... I asked you, did they pull them out before they said anything to them? And you said that's not right. Now, tell me I'm wrong. Your Honor, I don't know the precise timing. I believe there were verbal commands that were happening around the same time that they were drawing the weapons. But it is happening within seconds of when the police officers pull up. So that's the kind of show for me. When you pull your weapon, that's prepared for deadly force, right? Your Honor, I don't know the answer to that. Well, police officers don't pull their weapons unless they may be preparing for deadly force. And they don't shoot up in the air and wing people. When you fire your firearm, it's for deadly force, right? And when you draw it, you're doing it in terms of... You know, I mean, it doesn't say you're going to shoot someone, but you're preparing for deadly force for failing to stop at two stop signs at night. They pull their weapons out before they said anything to them. Your Honor, that fact is not in the record here. And I'm not... Okay, well, I'm just trying to get the context of here. Okay. After they saw the person in the floorboard, right? No, that's not the case. After they saw somebody in the floorboard? Tell me where that is in the timeline. Maybe I'm misunderstanding the timeline. Tell me where it is that they see Mr. Perry reaching under the seat or in the floorboard or however they describe it. That's happening at the time that they're pulling up to behind the vehicle where they see the defendant. Before they pulled their firearms. See him doing what? See him reaching towards the floorboard, Your Honor. They see him reaching... You mean reaching lower to a lower point? I mean, envision the seat you're in, they see him, his hands? I think they're looking at his back, but they're seeing him reaching towards the floorboard. I don't know that they can see his hands, but they can see his motion towards the floorboard. Okay. And that's okay. So that's the way they pull their weapons out. That's around the time they pull their weapons out. Yes. Okay. They pull their weapons out and both of them have exited the car, right? They've handcuffed them. That happens within about 25, 30 seconds of the stop. They're handcuffed. And so there's nothing... Whatever he may or may not have done in the vehicle could harm the police officer. Are we getting close to a Gantt situation here? Because he's already... They're both away from the vehicle. So the only suspicion right now for the stop is a traffic violation. So, Your Honor... And how does it escalate to asking about drugs and all these things? So just to be clear, there is no claim about illegality from the officers having drawn their firearms here. Claim of... No, I'm not talking about a claim. See, text without context is pretext. You have to have a context of what... They come up initially because you said they saw him reach toward... I don't see how you could see him reach toward. You may have seen him bend down, but it's impossible to see through two seats in a car in the trunk and see his hands reach anything at night. But anyway, that's... I guess everything is assumed to be what the police officer said he saw. But I don't think the police officer said he saw that. But anyway, he went down. That's what he said, I think. So the context is... I'm just trying to get to that. They've handcuffed both of them, right? Yes. And where are they placed? Ms. McCar's placed towards the front of the car. And the defendant is... Front of what car? The front of the suspect car, McCar's car. Outside of the car? That's right. And handcuffed? That's right. And he's placed in a cruiser, handcuffed? That's right. Okay. So they both... There's no way they could get to anything in that car at that point, is that right? Is that right? Absent some pretty extraordinary situation, I think that's right. The officer did testify that they were aware of people doing further dangerous things once a person had been handcuffed. It's not the be-all and end-all of officer safety, of course. But there's more to this situation than just the traffic offense. As I was saying on JA-510, there's also the open passenger door. There's the defendant, as we were discussing, reaching down towards the floorboard. The open passenger, what's suspicious about that? Your Honor, in isolation, it may not be suspicious. But the point is that this isn't meant to be a totality of the circumstances analysis. I'm giving you credit for that. How does that be a ding on you? You left your car door open. Police officers are behind you, right? Yes. And so you get out and leave your door open? That's unusual? It is unusual. And the officers hadn't seen anything like that before. And they hadn't seen anything like what they saw with the defendant doing. Jumping over from the passenger side over the center console and exiting out the driver's side door behind someone who had already gotten out of that door. As well as the officers aren't... So all of that is so unusual that justifies that kind of thing. Pulling your weapons because you saw them reach down and then handcuffing both of them for a traffic stop at this point in order to check out whether or not a tag is proper. I just want to see what the standard is in terms of police procedures for stopping regular citizens or it's just because they were in a neighborhood that you call now high crime. That is one of the factors in the totality of the circumstances. So basically being in that demographic area would justify the way they were treated on the beginning ab initio. Your Honor, the case law is quite clear that... I'm asking you. Do you think that that justified the way they were treated because they were in an area you call a high crime in terms of police work? Your Honor, it's clear that the simple fact standing alone without any other additional context of a high crime area is not sufficient to give rise to reasonable suspicion. But that's not all the officers had here. In addition to everything that I was just saying, the officers then conducted a pat down and found the blue bandana on the defendant's person. And around the same time, the officers were receiving over the dispatcher. You did a pat down. Was the bandana had some metal in it? No, bandana is a cloth. You're only looking for something that might hurt you like a knife or a weapon. So like, oh my goodness, this is an iron band. That doesn't make sense either. I mean, bandana, that's because you said pat down. You pat down, you know, I got a handkerchief and a fork square in my pocket. It doesn't feel like a gun or a knife. So that's, so then then, go ahead. So that's the question right there. Go ahead. There is no motion to suppress either down below and there's no challenge raised up here. The whole idea, it is because we're talking about a prolonged stop. Anything that might be gathered during that time and delayed time is part of the fruits of the poisonous tree. It is part of it. Go ahead. So the question is whether there was reasonable articulable suspicion. Is the suggestion that the pat down led to the discovery that he felt the bandana or is the testimony that he saw the bandana during the pat down? It's the latter, Your Honor. And going back to the timeliness issue, the question is whether or not the officers had reasonable articulable suspicion. For the bandana, what's the point of that? Because it was blue? It's blue. So if it had been green, it would have been okay? We don't know the answer to that, Your Honor. But the point here is that the officer testified that in his experience. I've seen a lot of cowboys. They have blue bandanas too and red ones. Would they be stopped too? They held boots and cowboys and coming from another part of town, they would be stopped too because they have a blue bandana. Matter of fact, it was around their neck. The stop had already occurred here, Your Honor. And I imagine if a cowboy came over the dispatch with an indication that he was affiliated with the Crips, as was the case here, the officer would probably behave similarly. Also, maybe the cowboy didn't look the part either. Your Honor, I don't think that that sort of claim is really at play. I don't think that sort of claim is really at play here. So what's the basis then that we have to take judicial notice that it's a high crime area? It was the officer's testimony and it hasn't been rebutted in any way. And that was a finding that was credited by the magistrate. America is a high crime area. Isn't it? Your Honor, I think the case law is in all of America. I don't know the answer to that, Your Honor. But you know, this little segment is an arrest right there. High instances of arrest and searches and things like that. That's correct. That was the testimony. And that is the record that all goes to whether or not it was under Jones, whether or not it was a delay, a delay for a traffic violation. And you justify why they were detoured so far as we have a blue bandana and they got out of the car on a, they didn't close that car door. They had a blue bandana. They both came out at the same, on the same side of the car. That's like, that's why you prolong it. And also he reached down. He bent down. Yes, Your Honor. There, in addition to all of those other things, it's also a high crime area. It's also apparent from the body-worn camera that the defendant dropped something as the officers were coming up to approach him. He said it was a cigarette. I don't know that it was ever recovered. He also lied about- He drops it. Why didn't the police officer pick it up? I don't know the answer to that, Your Honor. Where's the tape? That's lost too, huh? Are you talking about- The body cam, is that lost? No, that's on the body-worn camera, Your Honor. I mean, something I thought was misplaced. I think Your Honor is talking about the dash cam footage. Where's that? Where was that? The dash cam footage was not preserved in this case, Your Honor. And it was the subject of the motion to dismiss that my colleague mentioned. I'm happy to turn to that unless the court has any further questions about the basis for the stop. Can I ask you about the cell phone? Yeah, yes. The, Perry in this case is arguing that his, I guess it was his girlfriend, did not have the authority, apparent or actual authority. There was, I think the argument is no mutual authority. So I just wanted to see what your response to that argument is. Yes, we have an initial argument about the fact that the defendant didn't have any reasonable expectation of privacy in his cell phone at the time that Ms. McCarr turned it over to the police. But to more directly answer your question, the court here found, and these are under Lattimore factual matters, that Ms. McCarr had both actual and apparent authority to consent to the search of the cell phone at the time that she gave it over. And I do want to push back on one thing that my friend here said. She essentially implied that when the district court found that Ms. McCarr had actual authority, that there was an implicit finding that she did not have apparent authority. If the court were to look at JA 759, which is the order adopting, for the most part, the reporting recommendation, the district court says, the magistrate, yes, found that Ms. McCarr had apparent authority, or at least apparent authority. I find that she did not have just apparent authority, she had actual authority. When the court uses the word just, that is certainly not meant to be read as a finding that the court was disagreeing with the apparent authority analysis. And so either one of those is sufficient to allow this voluntary consent search to occur, even without a warrant. And again, also on JA 759, there are two important factual findings that are reviewable only for clear error. The first of which is that there was no evidence that the defendant put any express limits on the cell phone use. My colleague spent a significant portion of her argument trying to argue against that, essentially on a de novo review. But we're here on clear error, and the court cannot be said to have clearly erred in its review of the record before it, that there were no express limits. Indeed, she used it for her own general, personal, and exclusive use for a period of months before voluntarily ceasing to do so. Voluntary cessation is completely irrelevant to the common use and authority analysis. It's not as if the defendant told her to stop using it. She just decided to use it, to stop using it on her own when she got minutes back on her own phone. That does not vitiate authority. It does not vitiate consent here. Is it correct the counsel says that a weapon was found in her pocketbook? So the testimony, the best that I can read that record, Your Honor, is that the gun was in the purse, but sitting kind of on top of material in the open purse, with part of the handle being visible from just looking down into the purse. I don't get the sense from reading the record that someone had to unzip the purse in order to find it. So it's both kind of inside, but on top of the contents of the purse. That's how I understand the record. And that's consistent with somebody like the defendant trying to alienate himself from those in the four, five, six seconds that he has when he's reaching toward the floorboard at the beginning of the stop. And so, you know, that sort of dovetails us into the issue of whether or not there's sufficient evidence, and I see him running a little low on time, of the gun possession. But just to briefly touch on that, there's not only the physical evidence and the way the scene was when the officers encountered it, there's also Ms. McCart's testimony that the defendant had consistently possessed those guns for months before he came up with her to Virginia, that he pulled one of the guns on her and threatened her with it earlier in the day, and that the second gun was sitting on his lap when the officer started to pull them over. And that testimony alone is, it should be sufficient. I'm happy to turn to the dash cam. I'm happy to answer any other questions that this court may have. Do we know, just as a factual matter, do we know when the request to preserve the dash cam video was made? Was it made within the 30 days? I don't know the answer to that. I just want to make, the record doesn't tell us. We understand there was a request made, but we don't know when. That's my understanding. You don't know when the request was made? It was made, I know generally it was made by his counsel. When? I don't know the date. I don't know that we have the date in the record. I apologize. But we never argued that any potential delay somehow vitiates the motion to dismiss. I wasn't I couldn't find where that was, and I just thought I'd ask because you probably know the record better. Your honors, I'm coming down to time here unless the court has any further questions. Thank you. Mr. LeMay. May it please the court, thank you. Regarding the stop, the officers, first of all, the missing dash cam is an issue because once, as soon as the officers activate their lights, the dash cam comes on. The body cam doesn't come on unless and until an officer turns the body cam on, and that's why Pera's body cam was not on for most of the stop. And so had that dash cam been preserved, we would have been able to see exactly what was happening in terms of whether or not there was eluding. Were they merely speeding? And also the officers did lose sight of the vehicle for a matter of seconds. The dash cam would have showed whether or not they were actually eluding at all, and whether they stopped at all, failed to stop, all of that. Absolutely. And what the officers did when they bounded out of their car too. Absolutely. And that wasn't activated in this case. That's correct. It was not. The dash cam was not preserved, and Perry asked the officers multiple times to preserve it. It was a simple process in order to do so. They failed to do so. And as a result, we don't have a full picture in order to be able to say whether or not there is objectively reasonable, articulable suspicion of criminal activity. And these officers, once they did stop or come up upon the stopped vehicle, they drew their weapons immediately upon exiting that vehicle. In several cases we call that spoliation type things, when you're telling us that it's eluding and you don't have the information you should have had, call it spoliation. Correct. But we don't have it I guess here. But even with the body cam that we do have that Officer Miller was wearing, it's pretty clear that the officers pulled their weapons immediately upon exiting the vehicle before anything else occurred. It's our position that there was no legitimate basis for the stop. The weapons that were found inside of the vehicle cannot be appended to Mr. Perry, as I stated before. The revolver is in her purse. That's actual, exclusive possession. The Glock is somewhere buried under mouths of trash in her car. And this has a fingerprint on it, but it's not Mr. Perry's. And essentially that is the reason why they wanted Mr. Perry's phone. According to even the affidavit by Matthews, he is opining that in his training and experience, oftentimes convicted felons have pictures in their phones, etc. of themselves posing with these weapons. The officers know that for, it's our position that the officers know that they're not able to append those weapons in the car to Mr. Perry, and that's why they want evidence from the cell phone. There is no basis of finding that if a person hands over their phone to someone else and gives limiting restrictions for the use of that phone, that somehow that turns over into mutual use and mutual access. We're asking the court to not find that because if that were the case, almost every person in America would be surrendering their expectation of privacy in their own cell phone by merely allowing someone to use it. And in the case law in Riley, in fact, the Supreme Court states that society recognizes that a person has an expectation of privacy in their own cell phone and that and and and it can sit to someone's home. That says you basically have to have a warrant before you can go. What about Casella, which is a Fourth Circuit case, which is the same kind of facts here. But yes, the Casella case, Judge, first of all, it's an unpublished opinion, has no precedential value, is basically limited to the specific facts But what about it? What about the Holden in that case where? Totally distinguishable, Judge, because in that particular case, the plaintiff did not place any restrictions on the cell phone when she handed over to the boyfriend. She just gave the phone over to the boyfriend. And had that happened in this case, the government would be in a much stronger position. But the fact that in this case, even if he told her you can only use it, even if he tells her use it to, you know, for these purposes that I stated earlier, he is placing limitations and restrictions on the cell phone. We don't have that in that case. She, plaintiff, handed it over and because she did not place any restrictions or use, the court felt basically that, you know, she did not really have a basis to complain that that boyfriend allowed it to be viewed and searched. But it's total opposite of what we have here. So that case not only. Yeah, but I can't, the limitations, I'm just looking through the record trying to, because what I saw, and I just, if you can direct me as to these limitations, because what I saw was that she was using the phone, that she's calling him on the phone. He knew she was using the phone. She's texting on the phone. She's going, I think at one point she references the pictures, a picture of them together on the phone. So she's going through. So I'm trying to see where this apparent or actual authority over the phone. And she, and I think he told her you use it as much as you, because she didn't have minutes or something on her phone. So judge, it's by implication. If he tells her you're able to use my phone until you get minutes on your phone, by implication, once you get minutes on your phone, you're deceased using mine. And in fact, that's exactly what happened by her own testimony admission, as well as Matthew said, once she got minutes on her phone, she ceased to use her, his phone for her personal reasons. What about, because I asked you earlier about the restrictions and you said he told her you can't leave it in the car, take it in the car with you, leave it in the car. So I'm just trying to find those expressed, not implied restrictions that he placed upon the phone. Because if, I think that, because if that is the case, then there's, there may be a difference between Costello, but I get, I need to be able to find the expressed restrictions. Okay. If, I mean, whether it's by implication or express, if I hand my phone to someone that says you can use it to make a phone call, they're limited to making that one phone call. That to me, I mean, I don't say, and you can't use it for any other purpose. I don't believe I need to say that. If I say use my phone to send and receive text messages to my family, if that was the only purpose or only instruction that he gave her, that is a limitation on her use. If he says use it to send and receive or to make and receive phone calls, same thing. If he says keep it in the car with you, if he, you know, when he is enumerating purposes for her use, in my mind, those are limitations on her use. So to say that she can use it outside of that, there would have to be some evidence where he expressly authorized her to use, or if he didn't say anything at all, if he just gave it to her without saying use it for this, use it for that, et cetera. But specifically too, the fact that he says you can use it and, you know, until you get minutes on your phone, I think that speaks volumes. And clearly she understood that because once she got minutes on her phone, she stopped using his. And in fact, when Matthews got the phone, he had to charge it up because she had, and she indicated that once she got minutes on her phone, she had no further use for Perry's phone, which again supports the notion that she was only to use his phone until she got minutes on hers. Had she continued to use his phone even after that? Maybe. But, and I apologize, Judge, this record is massive and we have different actors saying different things at different times, but I think if we kind of put it all together and you have Matthews again, starting at the appendix, starting at 6-11, he's telling, testifying to what her uses of the phone were. And, you know, and I think further indication of that is that that phone call from the jail on or about March 14th, when Ms. McCarr is indicating that she had saw a picture on his phone of the two of them and the child and how they, quote, unquote, look so cute. He immediately said, did you put any, did you put any pictures on my phone? And she's like, oh, no, no, no. I was only looking at a picture that was on the phone. So when you kind of put, stream all of those things together, it's pretty clear that Mr. Perry was limiting and restricting her use. And in the record, he does tell her, take my phone with you and keep it with you along with my other belongings. And that is an express statement. You're not allowed to turn it over, you don't have consent to turn it over to law enforcement. If he tells her to take his phone back to Georgia with her and to keep it with his other property, she does not, you know, by implication, she doesn't have the authority to turn it over to the police. And again, had he just given her the phone and not said anything and walked away from the scene, we'd be more in the Casella case. But because he asked her to use it for specific purposes and she complied by not using it outside of those purposes and not even for her personal use when she got the minutes, clearly she was not authorized to turn that phone over to law enforcement. Thank you for the additional time. Thank you. Ms. Rene, I also recognize that you were a court opponent. On behalf of the Fourth Circuit, thank you so much for your service. We depend on lawyers like you to take these cases and some of them have voluminous records and it's always hard, but we really thank you so much for that. Mr. Hono, honestly, we recognize your able representation of the United States. We'll come down Greek Council and proceed to our final case.
judges: Roger L. Gregory, Julius N. Richardson, DeAndrea Gist Benjamin